# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-00-00028-CR

**Robert Edward Rogers, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF HARRIS COUNTY, 177TH JUDICIAL DISTRICT
### NO. 811,816, HONORABLE CAROL G. DAVIES, JUDGE PRESIDING

Appellant Robert Edward Rogers was convicted by a jury of the offense of indecency with a child by contact. *See* Tex. Penal Code Ann. § 21.11 (West Supp. 2001). The jury assessed his punishment at nine years' imprisonment and a $10,000 fine. On appeal, Rogers contends he did not receive effective assistance of counsel; the district court improperly admitted evidence of extraneous offenses; and the evidence was legally and factually insufficient to support the conviction. We will overrule these contentions and affirm the conviction.

### BACKGROUND

In 1990, Christiane Ramos (Ramos), the mother of the complainant, C.A.H., divorced C.A.H.'s biological father and traveled to Philadelphia to find appellant. Appellant is the biological father of Ramos's oldest daughter, Marie Christine Jackson (Jackson). Appellant had never met

Jackson and had not seen Ramos in twenty-nine years.[1] In early 1991, shortly after their meeting, appellant returned to Texas with Ramos, whom he married, and moved in with her and C.A.H., who was ten at the time. He remained at Ramos's home until about 1993 when he and Ramos divorced.

According to the testimony at trial, after residing with C.A.H. and Ramos for about a year, appellant began engaging in intimate conversations with the then eleven-year-old C.A.H., such as describing the male and female anatomy and oral sex. He also told her that he and his biological daughter from a previous marriage engaged in sexual activity when she was about the same age as C.A.H., that some countries allow family members to experiment with each other, that shoving a banana down her throat would make a sore throat go away, and asked her if she would perform oral sex on her mother. Appellant often summoned C.A.H. into a room where he was watching pornographic movies. During that period of time, appellant fondled C.A.H.'s breasts, gave her enemas, encouraged her to masturbate, and sometimes after physically holding her down or tying her up, he would place a vibrator on her genitals. C.A.H. testified that on one occasion, she came home from school and found appellant standing on the stairs under a sheet. When she tried to walk by, he grabbed her, carried her into a bedroom, threw her onto the bed, tried to remove her jeans and stick his tongue in her mouth until C.A.H. yelled, "Rape!"

C.A.H. first told her mother about appellant's conduct when she was a sophomore in high school and studying in France from August 1995 through July 1996. C.A.H. began seeing a therapist in 1999 and reported appellant's conduct to the police shortly afterwards.

---

[1] Appellant and Ramos were involved in a relationship when appellant was a United States serviceman and stationed in Ramos's native France. Jackson was conceived as a result of the relationship.

At trial, the State offered the testimony of C.A.H. and City of Houston Police Officer Kendall Clark, who investigated C.A.H.'s allegations. Appellant testified in his own defense and presented testimony from Mary Rogers, his wife at the time of the trial, and his two sons, Brynell Wallace and Robert Rogers. The State presented three rebuttal witnesses, Jackson, Ramos, and Jeanine Rogers (Jeanine), appellant's daughter from a previous marriage. Jackson testified that on several occasions after appellant married Ramos, he touched Jackson inappropriately and attempted to kiss her. On one occasion, appellant told Jackson that tribes in other countries permitted sex with children. Similarly, Jeanine testified that when she was about eight years old, her father climbed into bed with her one night and touched her vagina; when she was ten or eleven years old, appellant touched her breasts. He also told her that sex with animals was acceptable and that the Bible allowed a man to marry several women and even children. Appellant testified again during his rebuttal, but offered no other witnesses.

**DISCUSSION**

*Ineffective Assistance of Counsel*

Following the conclusion of the trial, appellant filed a motion for new trial on the grounds of ineffective assistance of counsel. At the hearing on appellant's motion, the district court heard testimony from both the appellant and his trial counsel, Lloyd Oliver (Oliver). The court denied appellant's motion for new trial, and appellant now claims the district court erred in its ruling.

The United States and Texas Constitutions guarantee the right to counsel at trial. U.S. Const. amend. VI; Tex. Const. art. I, § 10. This right has been interpreted as a right to reasonably effective counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Hernandez v. State*, 726

3

S.W.2d 53, 55-56 (Tex. Crim. App. 1986). Texas has adopted the federal standard for reviewing claims of ineffective assistance of counsel. *Hernandez*, 726 S.W.2d at 57. This standard, as articulated in *Strickland*, requires that we apply a two-pronged test: the appellant must show that (1) his trial counsel's performance was deficient, in that counsel made such serious errors that he was not functioning effectively as the "counsel" guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense to such a degree that the defendant was deprived of a fair trial. *Strickland*, 466 U.S. at 687.

To satisfy the first prong of the test, an appellant must demonstrate that counsel's performance was unreasonable under prevailing professional norms and that the challenged action was not sound trial strategy. *Id.* at 690; *Stafford v. State*, 813 S.W.2d 503, 506 (Tex. Crim. App. 1991). Trial strategy will be deemed inadequate representation only if counsel's actions are without any plausible basis. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994); *Ex parte Ewing*, 570 S.W.2d 941, 945 (Tex. Crim. App. 1978). The second prong of the *Strickland* test requires an appellant to demonstrate that counsel's deficient performance prejudiced the defense, thereby depriving the defendant of a fair trial; that is, there is a reasonable probability that but for counsel's deficient performance, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 694; *Jackson*, 877 S.W.2d at 771.

A party claiming ineffective assistance of counsel has the burden of proving his claim by a preponderance of the evidence. *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996). Review of counsel's representation is highly deferential, and courts indulge a strong presumption that trial counsel's actions fall within a wide range of reasonable representation and

might be considered sound trial strategy. *Strickland*, 466 U.S. at 689; *McFarland*, 928 S.W.2d at 500. Counsel's performance is not evaluated in hindsight but rather from counsel's perspective at the time of trial. *Strickland*, 466 U.S. at 689; *Ex parte Kunkle*, 852 S.W.2d 499, 505 (Tex. Crim. App. 1993). We consider the totality of counsel's representation in considering an ineffective-assistance claim; the claim cannot be established by isolating one portion of counsel's representation. *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986).

We review a district court's order denying a motion for new trial through the prism of an abuse of discretion standard. *State v. Gill*, 967 S.W.2d 540, 542 (Tex. App.—Austin 1998, pet. ref'd). Thus, we examine whether the district court's application of the *Strickland* test and denial of the motion for new trial was so outside the zone of reasonable disagreement that it is subject to reversal. *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992).

Appellant points to a variety of trial counsel's tactics in support of his ineffective-assistance claim, the first of which is Oliver's failure to file a pretrial *Brady* motion[2] for exculpatory evidence and failure to file any pretrial motions, such as a motion in limine, regarding extraneous offenses. He further complains that by failing to file a request for notice of extraneous offenses,[3] trial

---

[2] A *Brady* motion is a request that the State inform the defense of any exculpatory materials in its possession. *See Brady v. Maryland*, 373 U.S. 83 (1963).

[3] Texas Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs, or acts . . . may, however, be admissible for other purposes [besides proving character] . . . provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.

counsel sacrificed the opportunity to prevent a witness, Jackson, from testifying even though the State's Notice of Intent to Use Evidence of Extraneous Offenses fails to mention her. *See* Tex. R. Evid. 404(b).

Trial counsel's failure to file appropriate pretrial motions is not categorically deemed ineffective assistance. *Miranda v. State*, 993 S.W.2d 323, 327 (Tex. App.—Austin 1999, no pet.). Appellant must identify the basis in the record for the motions and how the motions would have benefitted appellant if they were filed. *Ryan v. State*, 937 S.W.2d 93, 104 (Tex. App.—Beaumont 1996, pet. ref'd). The record does not reveal trial counsel's strategy regarding his decision not to file pretrial motions. *See Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). During the motion-for-new-trial hearing Oliver could not recall why he had not filed pretrial motions, and he did not have his file with him to refresh his memory.

With regard to a *Brady* motion, the clerk's record includes a "Discovery Order," requiring the State "[t]o inform defense counsel of: . . . All exculpatory evidence pursuant to Brady v. Maryland and related cases." Thus, the district court had already ordered the State to turn over any exculpatory evidence, and Oliver may have believed a *Brady* motion was unnecessary. Moreover, during a pretrial hearing the day before the trial, Oliver informed the district court that the State's attorney had "made his file open until today. Frankly, I've had ample opportunity to see the State's file."

Assuming Oliver failed to file a motion in limine,[4] appellant did not satisfy the second prong of the *Strickland* test; that is, the record does not reflect that appellant was prejudiced and the outcome of the trial was unreliable as a result of this alleged omission. A traditional motion in limine is a motion requesting that the opposing party be directed to approach the trial court before offering specified types of evidence, asking certain questions, or otherwise going into particular areas before the jury. *Harnett v. State*, 38 S.W.3d 650, 655 (Tex. App.—Austin 2000, pet. ref'd). During the pretrial hearing, Oliver objected to evidence of extraneous offenses. Although the district court overruled the objection, she instructed the State's attorney not to "go into any extraneous matters without first approaching [the bench]." Moreover, before the State was allowed to present evidence of extraneous offenses on rebuttal through the testimony of Jackson and Jeanine, the district court entertained arguments from both parties regarding the admissibility of the extraneous-offense evidence. Thus, it appears even if Oliver failed to file a motion in limine, the district court nevertheless dealt with the extraneous-offense evidence as though a motion in limine had been granted.

---

[4] The clerk's record does not include a motion in limine, and the docket sheet does not reflect that one was filed. However, during the hearing on the motion for new trial, trial counsel testified that he produced a motion in limine for the court and asked the court to make a pretrial ruling with regard to the extraneous offenses. In addition, during the pretrial hearing, the district court entertained arguments regarding whether the State would be allowed to comment on extraneous-offense evidence. The State agreed not to delve into extraneous-offense evidence, except for evidence from the victim herself, without first approaching the bench and obtaining a ruling on admissibility. And on at least one occasion during the trial, the State's attorney referred to a motion in limine when addressing the court. Thus, the record does not affirmatively demonstrate this alleged basis for the ineffective-assistance claim. *See Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999).

Similarly, any prejudice appellant may have experienced due to Oliver's failure to file a request for notice of extraneous offenses is negligible since Jackson's testimony was admitted as rebuttal evidence. The State would not have been obligated to include rebuttal witnesses, such as Jackson, in its notice of extraneous offenses. *See Hoagland v. State*, 494 S.W.2d 186, 189 (Tex. Crim. App. 1973) ("To require the State to anticipate any possible defense of an accused and to furnish names of all possible witnesses and have the court refuse to permit them to testify if their names were not listed would be to require an impractical and undue burden."); *Creekmore v. State*, 860 S.W.2d 880, 892 (Tex. App.—San Antonio 1993, pet. ref'd) (holding that evidence of extraneous offenses may be admissible when door is opened by direct defense testimony or to rebut defensive theory). Furthermore, the district court signed a discovery order mandating the State to furnish to defense counsel "[n]otice of all extraneous offenses, with date, time and place, which may be admissible against defendant."[5] While Jackson's name and the content of her testimony were not included in the State's notice, during the hearing on the motion for new trial, Oliver testified that he was aware of the witness and her anticipated testimony, including the extraneous offenses.[6] Thus, appellant was not prejudiced by the State's failure to provide notice of its intent to call Jackson as a rebuttal witness.

---

[5] Once a court rules on a motion for discovery to request notice pursuant to Rule 404(b), the notice requirements of the rule are triggered. *Espinosa v. State*, 853 S.W.2d 36, 39 n.4 (Tex. Crim. App. 1993).

[6] Although the notice was filed on September 14, 1999, during the pretrial hearing, Oliver stated that the State had given him the notice only a few moments before the hearing. He later admitted that he had not yet read the notice thoroughly. Thus, it appears that if the State did indeed file its notice on September 14, Oliver failed to examine it prior to the pretrial hearing. Nevertheless, Oliver appears to have been familiar with the anticipated extraneous-offense evidence.

Next appellant argues that Oliver failed to adequately prepare for trial by failing to procure witnesses. Trial counsel is not necessarily ineffective for failure to call every witness requested by the defendant. *Tutt v. State*, 940 S.W.2d 114, 121 (Tex. App.—Tyler 1996, pet. ref'd). The failure to call witnesses at the guilt/innocence stage of a trial is irrelevant to a claim of ineffective assistance of counsel absent a showing that the witnesses were available and the defendant would have benefitted from the presentation of their testimony. *Id.* (citing *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983)); *O'Hara v. State*, 837 S.W.2d 139, 144 (Tex. App.—Austin 1992, pet. ref'd).

Appellant alleges Oliver should have subpoenaed appellant's sister from Philadelphia, Mildred McIntire, and his niece from Detroit, Robin Holden. Appellant fails to demonstrate whether the witnesses were available to testify, what evidence the witnesses would have provided if they had testified, and how their testimony would have affected the outcome of the trial.

Appellant also complains about Oliver's failure to produce appellant's two sons, Brynell Wallace (Wallace) and Robert Rogers (Robert), as rebuttal witnesses in his defense. Both Wallace and Robert testified on behalf of appellant during his direct defense. On direct examination, Wallace testified that he lived with appellant in Ramos's house during the summer of 1992 and he rarely witnessed appellant alone in the house with C.A.H. He also testified that he had never seen appellant conduct himself inappropriately around C.A.H. or any of his other sisters or stepsisters, including Jeanine. When questioned about Ramos, Wallace stated that she was always intoxicated and often left sexually explicit objects lying around the house, such as nude photos of herself, chains, whips, and pornographic videos. Robert provided similar testimony on behalf of the appellant. He

never witnessed appellant act inappropriately around C.A.H., and testified that C.A.H. thought fondly of appellant. He too testified that Ramos was always drunk and often left sexually explicit materials in plain view, such as pornographic videos and magazines.

After the defense rested, the State called three rebuttal witnesses, Jackson, Ramos, and Jeanine. As described above, Jackson and Jeanine recounted several incidents in which appellant touched each of the women inappropriately or engaged in inappropriate conversations with them. Ramos testified generally about the nature of her relationship with appellant and related her conversation with C.A.H. in which C.A.H. first informed her of appellant's criminal behavior.

Following the State's rebuttal, neither of the two sons was present in the courtroom.[7] Appellant was the only witness to testify during his rebuttal. However, both Wallace and Robert had already provided testimony controverting the rebuttal evidence provided by the State. Appellant fails to demonstrate what additional evidence his two sons would have provided if they had testified on rebuttal or how their testimony would have affected the outcome of the trial.

Appellant also complains that trial counsel failed to make proper objections at trial. Specifically, appellant complains that Oliver should have objected when Jeanine proclaimed, "The world has gained a pedophile," referring to appellant. Appellant fails to identify the specific objection that should have been made or to provide authority in support of his argument that the objection

---

[7] The reason for the two sons' absence during rebuttal is disputed. Appellant claims Oliver sent Wallace to pick up an offense report and then sent Robert to look for Wallace when he failed to return in time to testify on rebuttal. When neither son returned in time to testify, Oliver requested a continuance until the witnesses could be located; the motion was denied. During the motion for new trial hearing, Oliver denied having sent Wallace to retrieve an offense report. He stated that he did not believe either son could have provided helpful testimony.

10

would have been meritorious. *See Valdes-Fuerte v. State*, 892 S.W.2d 103, 112 (Tex. App.—San Antonio 1994, no pet.).

Assuming that an objection would have been sustained, appellant has also failed to demonstrate that Oliver's failure to object was not a plausible trial strategy. During the motion-for-new-trial hearing, Oliver could not recall the precise statement that appellant finds objectionable nor his reasons for choosing not to object. However, the record does not demonstrate that Oliver was devoid of any strategy nor does it reflect that Oliver employed a strategy that rendered his assistance ineffective. A decision not to object to inadmissible testimony can constitute a sound and plausible trial strategy. Indeed, Oliver may have chosen not to object because jurors are often offended by objections. Moreover, a review of Jeanine's testimony reveals that she was a hostile witness. Oliver may have decided to forego his objections and preservation of error in favor of attempting to gain sympathy with the jury. In any event, Jeanine's statement did not inject new evidence; her epithet was a reflection of her opinion of appellant. The jury had already heard evidence that appellant had touched Jeanine inappropriately when she was a child, and it was within Oliver's discretion to determine whether to highlight the evidence by objecting to the epithet, or to try to minimize the attention paid to such statements. *Cf. Darby v. State*, 922 S.W.2d 614, 625-26 (Tex. App.—Fort Worth 1996, pet. ref'd).

Appellant next contends that Oliver opened the door to the introduction of extraneous offenses by asking appellant to explain why he thought C.A.H. was lying. Appellant argues that if Oliver had limited his defense to a simple denial of the charges, the door would not have been opened to the admission of the extraneous-offense evidence. It appears from the record that Oliver

characterized this case as one of her word against his. In order to convince the jury he should be believed rather than C.A.H., appellant had to provide a motive for C.A.H. to lie. His defensive theory appears to have been that C.A.H. fabricated the allegations against appellant at the behest of C.A.H.'s controlling, domineering, and manipulative mother and that appellant actually attempted to shield C.A.H. from her mother's "deviant" behavior. Considering the facts and circumstances of this case, the theory seems plausible. A defensive theory and the manner in which it is presented are matters of trial strategy, and trial strategy is often accompanied by some amount of risk. While Oliver's strategy could be questioned in light of the extraneous-offense evidence that was admitted in rebuttal, trial counsel's strategy is not evaluated in hindsight, but from counsel's perspective at the time of trial. Appellant fails to show that Oliver's representation was unreasonable under prevailing professional norms. *See Strickland*, 466 U.S. at 688-89.

Next, appellant argues that a conflict of interest was created between himself and Oliver when the following exchange occurred between the prosecutor and appellant:

> [Prosecutor] Q. Isn't it true that you have given [C.A.H.] an enema before?
>
> [Appellant] A. Yes, sir.
>
> Q. So what you told this jury about not giving [C.A.H.] an enema, that was a lie yesterday?
>
> A. My attorney told me not to say it to the jury, so I didn't.
>
> Q. Your attorney told you, "Don't tell about the enemas," right?
>
> A. Yes, sir.

12

Following this exchange, Oliver attempted to elicit testimony from appellant clarifying that Oliver had only advised appellant not to volunteer any information but had never suggested that he lie. Appellant claims that this line of questioning amounted to a conflict of interest because Oliver became more concerned about defending himself against allegations of unethical conduct rather than defending appellant.

The Sixth Amendment assures the right to conflict-free representation by counsel. *Glasser v. United States*, 315 U.S. 60, 69-70 (1942); *Gray v. Estelle*, 616 F.2d 801, 803 (5th Cir. 1980); *Ex parte McCormick*, 645 S.W.2d 801, 806 (Tex. Crim. App. 1983). However, this right can be waived. *United States v. Greigg*, 967 F.2d 1018, 1021 (5th Cir. 1992); *United States v. Howton*, 688 F.2d 272, 274 (5th Cir. 1982). A valid waiver must be done knowingly, intelligently, and voluntarily. *Greigg*, 967 F.2d at 1021; *United States v. Garcia*, 517 F.2d 272, 277-78 (5th Cir. 1975). If an attorney perceives that an actual conflict of interest has developed, he has an affirmative duty to advise the court of the conflict, who may then inquire into the nature of the conflict. *Simons v. State*, 805 S.W.2d 519, 521 (Tex. App.—Waco 1991, no pet.) (citing *Holloway v. Arkansas*, 435 U.S. 475, 485-88 (1978); *White v. Reiter*, 640 S.W.2d 586, 597 (Tex. Crim. App. 1982)). If the trial court determines that an actual conflict of interest exists, the defendant should be made aware of the conflict, the potential hazards to his defense by continuing with such counsel, and his right to obtain other counsel. *Greigg,* 967 F.2d at 1022 (citing *United States v. Casiano*, 929 F.2d 1046, 1052 (5th Cir. 1991); *Garcia*, 517 F.2d at 277-78).

If the defendant demonstrates that he did not effectively waive his right to conflict-free counsel, he must then show that the conflict adversely affected his counsel's representation. *Cuyler*

*v. Sullivan*, 446 U.S. 335, 348 (1980). Once an actual conflict is shown to have adversely affected counsel's performance, a limited presumption of prejudice is warranted; a showing of prejudice is a necessary element to an ineffective assistance of counsel claim. *Id.* at 349-50.

We are not convinced that an actual conflict of interest existed in this case. The only evidence of attorney misconduct heard by the district court was appellant's own testimony in which he stated that Oliver had instructed him to lie. He later recanted this statement and agreed that Oliver had not encouraged him to lie, but rather had instructed him not to volunteer any information. The district court never admonished, threatened, or even warned Oliver that if appellant's testimony were true and Oliver had instructed him to lie, he could be facing some form of sanctions. *Cf. Greigg*, 967 F.2d at 1021-23. Indeed, even the State's attorney appeared to disbelieve appellant's testimony regarding whether Oliver encouraged appellant to perjure himself. There is no evidence that Oliver was struggling to defend both himself and appellant. *Cf. id.* at 1022.

Even if we were to agree that an actual conflict existed, however, appellant has failed to establish that the conflict adversely affected his counsel's performance. Appellant directs us to Oliver's questioning of subsequent witnesses about whether he ever instructed them to lie. Oliver also attempted to elicit testimony from witnesses for the State regarding whether the State's attorney instructed them not to volunteer any information that is not requested. Appellant characterizes this line of questioning as an attempt by Oliver to defend himself against any allegations of unethical conduct. However, Oliver had no reason to do so, as there was no indication that appellant's allegations might result in sanctions against Oliver. Rather, it appears that Oliver was attempting to explain the misunderstanding between himself and appellant in an effort to rehabilitate his own

14

credibility before the jury. Because appellant had already compromised his veracity by admitting to lying while under oath, Oliver's credibility became even more crucial since he would be arguing appellant's case to the jury. Although appellant may argue that a better tactic would have been for Oliver to ignore the troubling testimony and to refrain from calling further attention to it, Oliver was obviously taken by surprise and was not ineffective for choosing the strategy he used.

Similarly, Oliver's failure to offer rebuttal evidence regarding appellant's income did not render his assistance ineffective, as appellant contends. As he testified during the hearing on the motion for new trial, Oliver's trial strategy was to defend appellant against the accusation that he had given C.A.H. an enema. Whether appellant had the ability to financially support himself was not part of that strategy. Moreover, appellant fails to explain how the admission of such evidence would have affected the outcome of his trial.

Appellant claims that Oliver failed to request a proper limiting instruction and proper jury charge regarding the extraneous-offense testimony, arguing that such a failure rendered his counsel's assistance ineffective. *See* Tex. R. Evid. 105(a); *George v. State*, 890 S.W.2d 73, 76 (Tex. Crim. App. 1994). While appellant may have been entitled to a limiting instruction, we cannot say his counsel was deficient for not requesting one. *See Parmer v. State*, 38 S.W.3d 661, 671 (Tex. App.—Austin 2000, pet. ref'd). At the new trial hearing, Oliver could not recall his strategy in deciding not to ask for a limiting instruction, but the record does not reflect that Oliver had no strategy at all. He could have chosen not to draw further attention to the extraneous offenses by not requesting an instruction. *See id.* (quoting *Ryan v. State*, 937 S.W.2d 93, 104-05 (Tex.

15

App.—Beaumont 1996, pet. ref'd)).  In any event, appellant provides no analysis as to how the outcome of the trial would have been different had Oliver requested the limiting instruction.  *See id.*

Appellant also argues that Oliver failed to grasp the legal issues at trial.  He bases this argument on Oliver's testimony during the new trial hearing, in which he stated that the case was about the practice of giving C.A.H. enemas.  When put in context, however, it is clear that Oliver was not attempting to define the offense that appellant was charged with when offering this testimony.  Rather, he was responding to an inquiry regarding why he had chosen not to offer rebuttal evidence of appellant's income.

Appellant also argues that Oliver did not have a firm grasp of the law applicable to motions in limine.  Appellant fails to provide specific citations to the record in support of his argument and fails to analyze how the outcome of the trial was affected.  An independent review of the record, however, arguably supports appellant's contention that on a few occasions Oliver appeared confused when addressing legal issues before and during the trial.[8]  Nevertheless, the record also reveals that Oliver fashioned a plausible defense on behalf of the appellant within the framework of the anticipated evidence, actively participated in the jury trial, cross-examined the State's witnesses, presented defense witnesses, and made a jury argument.  In hindsight, it may be argued that Oliver could have adopted a different strategy in handling many of the objections during trial.

---

[8]  For example, before the State presented its rebuttal witnesses, the district court entertained arguments from both parties regarding the admissibility of the witnesses' testimony and extraneous-offense evidence.  Initially, the State intended to introduce sworn statements from Jeanine and Jackson.  The State argued that the statements were admissible to rebut the appellant's defensive theory and to rebut character evidence.  In response, Oliver focused his arguments on hearsay issues, and stated that his concerns would be allayed if the State brought the witnesses in to testify in person and subject themselves to cross-examination.  The State readily agreed to Oliver's request.

16

However, we may not judge trial counsel by hindsight. Appellant has failed to show that Oliver's performance was deficient to the extent that he made such serious errors that he was not functioning effectively as counsel. *See Strickland*, 466 U.S. at 690. Considering the facts of this case, Oliver's defensive theory and strategy were reasonable.

Finally, appellant urges that his trial counsel conceded his guilt during closing arguments when he stated, "I guess she's telling the truth," and, "Now, how are you gentlemen, how are you going to defend yourself against that? You cannot. There is no defense. We have no defense." He further maintains that the remarks were sexist.[9] During the hearing on the motion for new trial, however, Oliver explained that his strategy was not to concede appellant's guilt, but rather to propose to the jury that perhaps C.A.H. was telling the truth as she knew it, "as indoctrinated into her by her stepmother [sic]." And with regard to the other comments, Oliver testified that he was attempting to appeal to the male jurors in arguing that it is difficult to defend oneself against an allegation of sexual misconduct by a young girl, especially when it is her word against his. Oliver's comments do not reflect an unreasonable trial strategy. Furthermore, we are unconvinced that but for these comments, there is a reasonable probability that the results of the trial would have been different. Appellant's first issue is overruled.[10]

---

[9] Oliver also stated, "It's hard for me to tell – when I heard that little girl up there testifying, it's hard for me to tell – I'm a man. It's hard to tell when a woman is lying," and, "[I]t's hard for a gentleman to tell when a woman is telling the truth."

[10] Appellant also argues that the cumulative effect of his trial counsel's errors amounts to ineffective assistance. When reviewing an ineffective-assistance-of-counsel claim, we review the totality of the circumstances rather than isolated incidents and consider the cumulative effects regardless of whether "cumulative effect" is asserted as a basis for the claim. *See Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986).

*Extraneous Offense Evidence*

By his second issue, Rogers complains the district court erred in admitting extraneous offense evidence—namely, the testimony by Jackson and Jeanine. A trial court is given wide discretion to determine whether to admit or exclude evidence, and its decision will not be reversed absent an abuse of that discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990); *Couchman v. State*, 3 S.W.3d 155, 158 (Tex. App.—Fort Worth 1999, pet. ref'd).

Extraneous offenses are inadmissible to prove character conformity, but may be admissible when the door is opened by direct defense testimony or to rebut a defensive theory. Tex. R. Evid. 404(b); *Creekmore*, 860 S.W.2d at 892. "Where a false picture is presented by the defense, the prosecution may impeach the defense witnesses' testimony by introduction of extraneous offenses." *Creekmore*, 860 S.W.2d at 892.

In the present case, appellant's defensive theory was that Ramos controlled C.A.H. and encouraged her to make up the allegations against appellant. Appellant testified on his own behalf and presented a picture of Ramos as a depraved, inebriated mother who often left sexually explicit materials about the house in full view; appellant saw himself as a protector of the children, trying to shield them from Ramos's deviant behavior. In addition, appellant presented several witnesses who reiterated his assertions of Ramos's corruptible conduct. Appellant's two sons testified that appellant was not a pedophile, had never been seen to act inappropriately around C.A.H. or any of his other daughters or stepdaughters, and had always been regarded fondly by C.A.H.

By presenting this evidence and portraying himself and Ramos in this light, appellant opened the door to the extraneous-offense evidence. First, by suggesting that Ramos directed C.A.H.

18

to fabricate the allegations against him, appellant invited testimony from Jeanine. Because Jeanine was not related to Ramos and had not lived with her, and because she testified that appellant had acted inappropriately with her, Jeanine's testimony rebutted appellant's implication that C.A.H.'s accusations were a result of her mother's bidding. Similarly, by attacking Ramos's behavior around the children and portraying himself as a protector, appellant subjected himself to controverting evidence by Ramos. And finally, Jackson generally contradicted appellant's portrayal of himself as the protector of the children. The State had the right to inquire about relevant extraneous offenses to rebut the false impression presented to the jury by the appellant. We hold the district court's ruling fell within a zone of reasonable disagreement, *see Cantu*, 842 S.W.2d at 682, and overrule appellant's second issue.

### Legal and Factual Sufficiency of Evidence

By his third and fourth issues, appellant challenges the legal and factual sufficiency of the evidence. To determine the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict and ask if any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 318-19 (1979); *Griffin v. State,* 614 S.W.2d 155, 158-59 (Tex. Crim. App. 1981). Review of a factual-sufficiency complaint requires us to consider all of the evidence without regard to whether the evidence is favorable to either the State or the appellant. *See Clewis v. State,* 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). We are to weigh the evidence equally, maintaining appropriate deference to the jury's verdict. *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). We may find the evidence factually insufficient only when the record clearly indicates that the

verdict is wrong and manifestly unjust. *Id.*; *Clewis*, 922 S.W.2d at 135. The standard of review is the same for both direct- and circumstantial-evidence cases. *King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995). The State may prove its case by circumstantial evidence so long as it proves all of the elements of the charged offense beyond a reasonable doubt. *Easley v. State*, 986 S.W.2d 264, 271 (Tex. App.—San Antonio 1998, no pet.) (citing *Jackson*, 443 U.S. at 319).

The jury is the exclusive judge of the facts to be proved, the weight to be given the testimony, and the credibility of the witnesses. Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995). The jury may accept or reject any or all of the evidence presented by either party. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). The jury is free to draw reasonable inferences from basic facts to ultimate facts. *Welch v. State*, 993 S.W.2d 690, 693 (Tex. App.—San Antonio 1999, no pet.).

A person commits the offense of indecency with a child if that person (1) knowingly or intentionally, (2) engages in sexual contact, (3) with a child, (4) younger than seventeen years of age, (5) who is not the spouse of the accused. Tex. Penal Code Ann. § 21.11(a)(1), (a)(2); *Hill v. State,* 852 S.W.2d 769, 771 (Tex. App.—Fort Worth 1993, pet. ref'd). The Penal Code defines "sexual contact" as "any touching of the anus, breast, or any part of the genitals of another person with intent to arouse and gratify the sexual desire of any person." Tex. Penal Code Ann. § 21.01(2) (West 1994). The culpable mental state for this offense is specific intent to arouse and gratify sexual desire. *Washington v. State,* 930 S.W.2d 695, 698 (Tex. App.—El Paso 1996, no pet.).

Appellant argues that C.A.H. had "very vague memories of when the offense or offenses were supposed to have occurred" and that her testimony "was so vague and inaccurate with

regard to timing and chronology as to be unbelievable." He further contends that C.A.H. did not claim that he "had ever touched her vagina with his hands directly, nor had he used his penis to assault her" and that there was no testimony that he "became aroused or gratified by any of the acts [] alleged."

The complainant testified that the events she described took place beginning in early 1991 and continued through mid-1993 or early 1994, while she and appellant were living in the same house. C.A.H. also testified that appellant had fondled her breasts, had placed a vibrator on her genitals, and had given her enemas. Finally, the jury heard evidence that appellant masturbated in areas of the house where C.A.H. could easily see him and would often summon C.A.H. to his bedroom while viewing pornographic movies.

We hold that this evidence is both legally and factually sufficient for the jury to determine when the events occurred, whether appellant engaged in sexual contact with C.A.H., and whether his intent was to arouse or gratify his sexual desire. *See McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. 1981) (holding requisite specific intent to arouse or gratify sexual desire may be inferred from defendant's conduct, remarks, and all surrounding circumstances). We overrule appellant's third and fourth issues.

**CONCLUSION**

21

Having overruled all of appellant's issues presented, we affirm the district court's judgment.

_____

Lee Yeakel, Justice

Before Chief Justice Aboussie, Justices Yeakel and Patterson

Affirmed

Filed:   June 29, 2001

Do Not Publish